Lillie Whidden, as Administratrix of the Estate of T. G. Albritton, Deceased, v. Sunny South Packing Co.

162 So. 503.

Division B.

Opinion Filed June 24, 1935.

*W. W. Whitehurst,* for Appellant;

*Leitner & Leitner,* for Appellee.

BUFORD, J.—Sunny South Packing Company, a Corporation, was the assignee of L. Maxcy, Inc., of a citrus fruit marketing contract between T. G. Albritton, the grower, and L. Maxcy, Inc., the packer. The contract was made on April 10, 1930, and covered the grower's crops for the seasons of 1930-1931, 1931-1932, 1932-1933, 1933-1934 and 1934-1935, produced on the SE¼ of SE¼ of Sec. 1, Twp. 36, Range 23, in Hardee County, Florida. The present consideration of the contract was $456.46 and the covenants contained in the contract.

Sections 4, 5, 10 and 11 of the contract were as follows:

"4.  The Company agrees to advance to the grower sufficient fertilizer for the proper cultivation of said grove property and as agent of the grower to pick, haul, and/or receive said fruit and to handle the marketing of same whenever there is an available market which in the judgment of the company shall justify shipping, and at such times and in such quantities as it shall deem for the best interest of the grower. The grower hereby agrees that he will not sell or otherwise dispose of said fruit to any person or corporation other than through the company as his marketing agent. The company may at any and all times enter upon said premises to inspect said fruit.

"5.  The grower shall receive the net proceeds realized from the sale of his fruit, after deducting the actual cost of picking and hauling, the regular charges per packed box assessed by the company in the packing house where the fruit is handled, for packing and for coloring, chemically treating and-or pre-cooling when colored, chemically treated and/or pre-cooled, twenty (20c) cents per packed box for marketing and any other expenses incurred by the company in handling the growers' fruit, including any expense for transportation and/or refrigeration, inspection,

selling facilities or services other than of the company itself and/or any assessments levied under the laws of the State of Florida or the United States, together with any and all advances made during the term thereof.

"10. It is further agreed and understood that any and all loans and/or advances to the grower, and any and all payments, costs or expenses incurred by the company in inspecting, picking, hauling, processing, packing, delivering, shipping, selling, marketing, collecting claims by legal process or otherwise, or in any manner handling the grower's fruit under the terms of the contract, and all other items hereinbefore referred to as 'advances' shall be deemed and construed to be 'advance' by the company to the grower and shall be included in the lien hereinafter given by the grower to the company.

"11. This agreement shall be and continue in full force and effect from the date hereof for a period of five years, with the privilege, however, to the company to cancel and terminate the same by serving ten days notice in writing, said cancellation not to affect in any way the rights and obligations of the parties with reference to the handling of the fruit already marketed or picked. It is further agreed that the lien and mortgage herein granted against said property shall continue in full force and effect until all indebtedness owing by the grower to the company shall have been fully paid, even though such time extend beyond the five-year term above granted.

"For the purpose of securing the payment of all loans and 'advances' referred to in this contract, and all renewals and extensions thereof, and to secure the payment of any and all further loans and 'advances' which may be hereafter made by the company to the grower, and any other indebtedness, the grower hereby grants, bargains,

sells, transfers, pledges and mortgages unto the company, its successors and assigns forever, all of the citrus fruit crops now growing or in the future to be grown or raised during the continuance of these presents upon the lands hereinbefore described and does hereby grant, bargain, sell, convey and confirm unto the company, its successors and assigns forever all of the above described lands."

On September 10, 1933, T. C. Albritton died, intestate. Thereafter, Lillie Whidden was appointed as administratrix of the estate. Later she procured an order of the Probate Court authorizing her as administratrix to take possession of the real estate herein described as assets for the payment of debts due by the estate.

On October 10, 1934, she filed bill of complaint seeking to enjoin the assignee of the contract from removing fruits from the grove as contemplated by the contract of the crop of the season 1934-1935. She did not pay or offer to pay the indebtedness which had accrued under the terms of the contract. The theory of the bill is that upon the death of Albritton the contract terminated.

A temporary restraining order was granted and afterwards dissolved.

From the order dissolving the restraining order this appeal was taken.

Thereafter, supersedeas was granted.

To the motion to dissolve the restraining order there was attached and made a part thereof an affidavit made by one S. L. Albritton, the son of the deceased T. G. Albritton, which was as follows:

"Before me, the undersigned authority, personally came S. L. Albritton to me well known, who first being duly sworn, deposes and says that he is the eldest son of the late T. G. Albritton, deceased; that the said T. G. Albritton at

the time of his death was the head of a family and resided on the SE¼ of SE¼ of Section 1, Township 36 South, Range 23 East and the SW¼ of SW¼ of Section 6, Township 36 South, Range 24 East; that at the time of the death of his said father, the said T. G. Albritton, was a widower but this affiant and this affiant's wife together with their three children made their home with the said T. G. Albritton and had resided with him for more than two years continuously before the death of the said T. G. Albritton; that the said T. G. Albritton had lived upon the said land as his said homestead for approximately sixty (60) years, and at no time did the said T. G. Albritton abandon the said property as his homestead, and at all times for approximately sixty (60) years last past the said property had been the homestead of the said T. G. Albritton and he had been head of a family residing thereupon.

"Affiant further swears that at the time of the death of the said T. G. Albritton, he left surviving him seven sons and daughters and two grandchildren by a deceased daughter, and recently, to-wit during July of 1934 all of the heirs save and except the complainant, Lillie Whidden, and Walter W. Albritton conveyed the said property to a corporation, Double S. Fruits, Inc., a Florida corporation, and that upon the sale of the said property this affiant was put in possession of the said property by the said corporation and is now in possession of the said property for the corporation and has so been for more than thirty days last named.

"Affiant further swears that at this time there is a very valuable fruit crop situated upon the said citrus grove on the said property, of the value of more than two thousand dollars and this citrus crop is in need of spraying for rustmite and other insects and unless this work is put imme-

diately upon the said fruit crop it will be an entire loss to the owners of the said property.

"Affiant further swears that during the life of his father, the said T. G. Albritton, the said T. G. Albritton mortgaged his property and leased the fruit crop to L. Maxcy, Inc., and after the death of the said T. G. Albritton this mortgage and lease, which is sued on herein or made a part of the bill herein, was assigned to the Sunny South Packing Company and the Sunny South Packing Company has been working and caring for the said property since said time and the said Sunny South Packing Company had its sprayers and spraying material on the property ready to spray the said fruit when the employees were ordered away from the said property by the complainant or her agents or someone for her.

"Affiant further swears that the said property in question in this suit was the homestead of the said T. G. Albritton and was not and is not now subject to any of the debts of the later T. G. Albritton."

Contracts such as the one here under consideration have uniformly been held valid. The contract by its terms vests in the shipper, or company, as the shipper is referred to in the marketing contract, not only an agency but also an interest which interest continues until advances made under the contract are paid. Therefore, it is not such a contract as is discharged by the death of the grower. In Hunt v. Rousmanier's Administrators, 5th Law Ed. 589, the Supreme Court of the United States held:

"This general rule that a power ceases with the life of the person giving it, admits of one exception. If a power be coupled with an 'interest,' it survives the person giving it, and may be executed after his death.

"As this proposition is laid down too positively in the

books to be controverted, it becomes necessary to inquire what is meant by the expression 'a power coupled with an interest.' Is it an interest in the subject on which the power is to be exercised or is it an interest in that which is produced by the exercise of the power? We hold it to be clear that the interest which can protect a power after the death of a person who creates it, must be an interest in the thing itself. In other words, the power must be engrafted on an estate in the thing.

"The words themselves would seem to import this meaning. 'A power coupled with an interest' is a power which accompanies, or is connected with, an interest. The power and the interest are united in the same person. But if we are to understand by the word 'interest' an interest in that which is to be produced by the exercise of the power, then they are never united. The power, to produce the interest, must be exercised and by its exercise is extinguished. The power ceases when the interest commences, and, therefore, cannot, in accurate law language, be said to be 'coupled' with it.

"But the substantial basis of the opinion of the court on this point is found in the legal reason of the principle.

"The interest or title in the thing being vested in the person who gives the power remains in him, unless it be conveyed with the power, and can pass out of him only by a regular act in his own name. The act of the substitute, therefore, which in such a case, is the act of the principal, to be legally effectual must be in his name, must be such an act as the principal himself would be capable of performing, and which would be valid if performed by him. Such a power necessarily ceases with the life of the person making it. But, if the interest or estate passes with the power, and vests in the person by whom the power is to be exercised.

such person acts in his own name. The estate, being in him, passes from him by a conveyance in his own name. He is no longer a substitute acting in the place and name of another, but is a principal acting in his own name, in pursuance of powers which limit his estate. The legal reason which limits power to the life of the person giving it exists no longer and the rule ceases with the reason on which it is founded. The intention of the instrument may be effected without violating any legal principle.

"This idea may be in some degree illustrated by examples of cases in which the law is clear, and which are incompatible with any other exposition of the term 'power coupled with an interest.' If the word 'interest' thus used indicated a title to the proceeds of the sale, and not a title to the thing to be sold then a power to A to sell for his own benefit would be a power coupled with an interest; but a power to A to sell for the benefit of B would be a naked power which would be executed only in the life of the person who gave it. Yet, for this distinction, no legal reason can be assigned. Nor is there any reason for it in justice; for, a power to A to sell for the benefit of E may be as much a part of the contract on which B advances his money as if the power had been made to himself. If this were the true exposition of the term, then a power to A to sell for the use of B, inserted in a conveyance to A, of a thing to be sold, would not be a power coupled with an interest, and, consequently could not be exercised after the death of the person making it; while a power to A to sell and pay a debt to himself, though not accompanied with any conveyance which might vest the title in him, would enable him to make the conveyance, and to pass a title not in him, even after the vivifying principle of the power had become extinct. But every day's experience teaches us that the law

is not as the first case put would suppose. We know that a *power to A to sell for the benefit of B, engrafted on an estate conveyed to A, may be exercised at any time and is not affected by the death of the person who created it.* It is, then, a power coupled with an interest, although the person to whom it is given has no interest in its exercise. His power is coupled with an interest in the thing which enables him to execute it in his own name, and is, therefore, not dependent on the life of the person who created it." (Italics supplied.)

In 13 C. J. 644, Sec. 719, the author says:

"Death or Disability of Person.—Contracts to perform personal acts are considered as made on the implied condition that the party shall be alive and shall be capable of performing the contract, so that death or disability will operate as a discharge. The right to regard the contract as discharged by the death of a party is reciprocal, and a party whose personal representative would not be bound to perform in case of his death cannot, on the death of the other party, charge such party's representative.

"Exceptions to the Rule.—The rule does not apply where the acts are of such a character that they may be as well performed by others as by the promisor's personal representatives, nor where the contract by its terms shows that performance by others was contemplated, nor where sickness is to be anticipated."

In 6 R. C. L. P. 1009, Sec. 372, it is said:

"Generally, the death of a party does not terminate a contract if it is not of a personal nature. The parties may, of course, by express terms, agree that the contract shall be strictly a personal one, and thus by the terms of the contract, exclude substituted performance."

It is clear from the terms of the contract here under

consideration that those acts to be performed under the contract by the grower were not of a personal nature but could be performed by the heirs or representatives of the grower. Therefore, it follows that the administratrix cannot terminate the contract, nor can she procure a judicial determination that it is terminated because of the death of the grower and certainly, before she would have any standing in a court of equity to avoid the enforcement of the contract, she would have to come in offering to do equity, that is to pay what may be found to be due the shipper for advances and other charges accruing under the terms of the contract.

For the reasons stated, the order appealed from should be affirmed.

It is so ordered.

ELLIS, P. J., and TERRELL, J., concur.

WHITFIELD, C. J., and BROWN and DAVIS, J. J., concur in the opinion and judgment.